UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PETRUS J. WINTER,

                      Plaintiff,

   -against-

AMERICAN INSTITUTE OF MEDICAL
SCIENCES & EDUCATION,

                    Defendant.

No. 15 CV 7538 (NSR)
**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

    Plaintiff Petrus J. Winter ("Winter" or "Plaintiff") brings this action against American Institute of Medical Sciences & Education ("AIMS" or "Defendant"), a private health training school that offers certificate degree programs. In October 2014, Winter graduated from AIMS Education with a certificate in magnetic resonance imaging technology ("MRI Tech"). Shortly after graduating, Winter sat for and passed the national examination administered by the American Registry for Magnetic Resonance Imagining Technologists ("ARMRIT"), a certifying board that lists successful examinees in its registry. Upon being certified in magnetic resonance imaging, Winter started to apply for positions as an MRI Technologist, but despite his "active[] and diligent[]" efforts, he has not received a single job offer.

    Asserting that he is "legally unemployable as an MRI Technologist," Winter is now suing AIMS Education. (Compl. ¶ 12, ECF No. 1.) Specifically, Winter alleges that AIMS (1) breached a quasi or implied-in-law contract; (2) engaged in fraud and misrepresentation; and (3) engaged in unfair and deceptive business practices. AIMS moves to dismiss the action and argues that (1) Winter's entire suit is barred by the educational malpractice doctrine; (2) the breach of contract claim fails because Winter signed an express enrollment contract with AIMS Education; and (3)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/17/2017

the fraud claim fails because Plaintiff failed to plead the elements with the specificity required by Rule 9(b) of the Federal Rules of Civil Procedure. (*See* Def.'s Mem. of Law in Supp. of Def.'s Mot. to Dismiss ("Def.'s Mem.") at 1-2, ECF No. 15.) Alternatively, AIMS moved to transfer the action to the United States District Court for the District of New Jersey, pursuant to Title 28, United States Code, Section 1404(a). (Def.'s Mem. at 22.)  For the reasons explained below, Defendant's motion to transfer is DENIED in its entirety and Defendant's motion to dismiss is GRANTED in its entirety.

## BACKGROUND

The following facts – which are taken from the Complaint, documents it incorporates, and matters of which the court may take judicial notice – are construed in the light most favorable to Plaintiff. *See, e.g.*, *Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013); *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009); *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

The relevant facts are relatively straightforward.  AIMS Education is a private, allied health training school organized and existing under the laws of New Jersey with its principal place of business in Piscataway, New Jersey.  (*See* Def.'s Mem. at 3.)  The school is approved by the U.S. Department of Education and State of New Jersey Department of Education, and its MRI certificate program is accredited by ARMRIT.  (*Id.*)

Winter, who is domiciled in New York, is seeking to be employed as an MRI Technologist and despite having graduated from AIMS Education and obtained his certificate from ARMRIT, he has not received a single job offer.  (Compl. ¶ 20.)  The Complaint alleges that AIMS Education improperly induced Plaintiff to enroll in its MRI program and, accordingly, failed to properly train him with certain skills required by "almost every available employment opportunity for an MRI

Technologist." (Compl. ¶ 13.) Plaintiff reasons that because "it is impossible for [him] to find employment as an MRI technologist" Defendant's program is "absolutely worthless." (Compl. ¶ 20.)

On or about December 2011, Winter first learned about MRI certificate program offered at AIMS from the school's website, which advertised that "(t)he number of MRI job opportunities is growing faster than the availability of qualified MRI Technologists," "result(ing) in tremendous career opportunities for all of our graduates." (Compl. ¶ 6.) The same website represented the "minimum requirements" to enroll in the MRI Tech program as a "High School Diploma or GED." (*Id.*) The same further represented that the school offered a "[c]omprehensive education and training" course that included, *inter alia*, "IV [intra-venous] therapy." (*Id.*)

Motivated by these representations, Plaintiff traveled to New Jersey on January 23, 2012, for an informational interview with the school's administrative director, Mr. Chirag Patel. (Compl. ¶ 7.) During this introductory meeting, Mr. Patel explained that the school's MRI program is accredited by ARMRIT and not the American Registry of Radiologic Technology ("ARRT"). (Compl. ¶¶ 9, 19.) The pleadings – read most liberally – suggest that employers favor technicians who are certified by ARRT.[1] (Compl. ¶¶ 14, 17.) Whereas both ARMRIT and ARRT require candidates to complete a board-accredited professional program,[2] such as AIMS's MRI certificate program, ARRT (referred to by Plaintiff as "the primary credentialing organization in the United States") seems to set a higher bar for entry.[3] (Compl. ¶ 17.) For instance, ARRT technicians

---

[1] The Court notes that both parties rely on a string of conclusory arguments to argue their positions. This is true of all the pleadings and memorandum submitted to date.

[2] A program in radiography, nuclear medicine technology, radiation therapy, magnetic resonance imaging, or sonography.

[3] Complaint alleges that "as of January 1, 2015," "ARRT, the primary credentialing organization in the United States … requires as a minimum, that candidates for ARRT certification examinations must have an Associate's Degree, but prefer (and it may in the near future, be a requirement) that such candidates have a Bachelor Degree, effectively ending non-degree granting diploma programs." (Compl. ¶ 17.)

must have completed training in *both* MRI and radiology whereas ARMRIT certifies technicians competent in *only* MRI.  Moreover, ARRT candidates must have earned the equivalent of a U.S. associate degree from an accredited institution, whereas ARMRIT will accept high school diplomas or GED.  Concerned that employers would prefer technicians certified by ARRT, Winter asked Mr. Patel "about ARMRIT's level of acceptance" in the field during their initial interview. (Compl. ¶ 19.)  Winter also explained that he had earned the equivalent of a bachelor's degree in the Netherlands.  (Decl. Michael H. Freeman, Esq. in Supp. of Mot. to Dismiss ("Freeman Decl."), ECF No. 16, Ex. 3 ("Initial Review Questionnaire").)  Winter alleges that Mr. Patel "falsely and disingenuously" responded "that ARMRIT was accepted everywhere." (Compl. ¶ 19.)  Relying on these guarantees, Winter enrolled in AIMS on January 23, 2012.  (Compl. ¶¶ 7-9, 11.)

On January 23, 2012, Winter signed the two documents governing the agreement.  First, Winter signed the "Enrollment Contract," a sparse one-page document that includes the following disclaimer:

> No representative of AIMS EDUCATION has promised me employment or any specific starting salary.  The student acknowledges that AIMS EDUCATION (i.e. the school) does not warrant or guarantee that successful completion by the student of the programs will result in the student obtaining employment in any field or profession.

(Freeman Decl., Ex. 4. ("Enrollment Contract").)  This disclaimer appears at the bottom of the one-page contract, immediately preceding Winter's signature.

Second, Winter signed an "Employment / Registry Assistant Consent," with the principal understanding that "finding employment is a joint effort between the school and [Winter]." (Freeman Decl., Ex. 6 ("Employment Consent Form").)  The one-page consent form also states, in relevant part, that "[t]he student acknowledges that AIMS EDUCATION (i.e., the school) does

not warrant or guarantee that successful completion by the student of the programs will result in the student obtaining employment in any field or profession." *Id.* At the same time, Winter was also handed a single-page advertisement reiterating what Winter learned from the school's website: "[t]he availability of magnetic resonance imaging (MRI) job opportunities is growing faster than the number of qualified medical MRI technologists." (Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Opp'n Mem.") at 3, ECF No. 18.)

After signing these two documents, AIMS Education mailed Winter published catalogs describing the MRI Certification Program as one "designed to prepare high school graduates to become MRI technologists and preparing them to sit for the ARMRIT Registry certification examination in Magnetic Resonance Imaging." (Freeman Decl., Ex. 2 ("Course Catalog"), at 59.) The Course Catalog also stated that students would be instructed for a total of "1980 clock hours," "75" of which were designated as "CPR, Venipuncture, Intra Venous Therapy Skills." (*Id.* at 60.)

Winter started his evening course on October 22, 2012. Between October 2012 and August 2014 (approximately twenty-two months), Winter traveled to New Jersey every weekday for instruction, and successfully completed the course requirements. By the time Winter graduated in August 2014, he had paid a total tuition of $29,550.00. (Compl. ¶ 8.)

In his exit graduation survey dated September 25, 2014, Winter "stated that he was completely satisfied with the quality of his education at AIMS Education." (Compl. ¶ 20.) Then in October 2014, Winter prepared for and passed ARMRIT's certification exam. Soon after obtaining his ARMRIT certificate, Winter "actively and diligently" applied for positions as an MRI Technologists. (*Id.*) As of the Complaint's filing date, Winter had "not received a single offer of employment." (*Id.*)

Winter filed this lawsuit on September 23, 2015.  (*See* ECF No. 1.)  According to the Complaint, AIMS Education also made a series of false statements and representations that inflated the rigor of its training, the success of its graduates, and Winter's prospective employment opportunities.  (Compl. ¶¶ 16, 19-20; respectively).  Specifically, Winter alleges that (1) Defendant's fraudulent scheme induced him to enroll in a certificate degree program, (2) deprived him of essential skills required of almost every available job opportunity (i.e., intra-venous therapy skills), and (3) rendered him "legally unemployable as an MRI Technologist." (Compl. ¶ 12.)  The Complaint alleges breach of implied or quasi contract (*id.* ¶¶ 21-26), fraud and misrepresentation (*id.* ¶¶ 27-33), and unfair and deceptive business practices (*id.* ¶¶ 34-38).  Defendants move to dismiss the Complaint in its entirety, moving in the alternative to transfer the case to the District of New Jersey.

## LEGAL STANDARDS

### A.  Motion to Transfer

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).

In considering a motion to transfer venue, the inquiry is twofold.  *Freeplay Music v. Gibson Brands*, No. 16-CV- 457 (VM), 2016 WL 4097804, at *1–2 (S.D.N.Y. July 18, 2016) (citing *Smart Skins v. Microsoft*, No. 14-CV-10149, 2015 WL 1499843, at *4 (S.D.N.Y. Mar. 27, 2015) ("The Second Circuit applies a two-part test to motions to transfer venue under § 1404(a).").  First, the court must determine whether the action could have been brought in the proposed transferee forum. *See AEC One Stop Grp. v. CD Listening Bar*, 326 F. Supp. 2d 525, 528 (S.D.N.Y. 2004) ("The

threshold question in deciding transfer of venue … is whether the action could have been brought in the transferee forum.").

If the action could have been filed in the proposed transferee district, the court must then determine whether transfer is appropriate.  This inquiry is guided by a non-exhaustive list of factors, including: (1) the plaintiff's choice of forum, (2) the convenience of the witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of the parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, (7) the relative means of the parties, (8) the forum's familiarity with the government law, and (9) trial efficiency and the interest of justice.  *See, e.g., N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am. Inc.*, 599 F.3d 102, 112 (2d Cir. 2010); *Larew v. Larew*, No. 11-CV-5771 (BSJ) (GWG), 2012 WL 87616, at *3 (S.D.N.Y. Jan. 10, 2012).

"No one factor is dispositive and the relative weight of each factor depends on the particular circumstances of the case."  *Smart Skins*, 2015 WL 1499843, at *4.  However, because the discretion under Section 1404 " 'must be exercised at the very outset of the case, when relatively little is known about how the case will develop, courts have typically accorded substantial weight to the [eighth] factor, plaintiff's choice of forum.'"  *Atl. Recording v. Project Playlist*, 603 F.Supp.2d 690, 695 (S.D.N.Y. 2009); *see also Columbia Pictures Indus. v. Fung*, 447 F. Supp. 2d 306, 309 (S.D.N.Y. 2006) ("Absent a clear cut and convincing showing by defendant that the balance of convenience weighs strongly in favor of the transferee court, plaintiff's choice of forum will not be set aside.").

7

B.  12(b)(6) Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), the complaint must plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[4] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

C.  Rule 9(b)

Finally, to the extent that a plaintiff alleges fraud, Rule 9(b) requires the plaintiff to plead his claims "with particularity," specifying "the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  In particular, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (internal quotation marks omitted).  Failure to satisfy the Rule 9(b) standard, if applicable, is grounds for dismissal.  *See, e.g.*, *id.* at 293; *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

## DISCUSSION

As noted above, Plaintiff brings claims for (1) breach of contract, (2) fraud and misrepresentation, and (3) unfair and deceptive business practices.  (Compl. ¶¶ 21-38.)  Defendant moves to dismiss on several grounds.  First, it argues that because all of Plaintiff's claims arise

---

[4] A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.* and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555. If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

from the theory that his education was deficient, the entire Complaint is barred by the educational malpractice doctrine.  (Def.'s Mem. at 1, 8-16.)  Second, Defendant moves, presumably pursuant to Rule 12(b)(6), to dismiss any of Plaintiff's surviving claims.  (*Id.* at 16-17.)  Finally, Defendant moves, pursuant to Rule 9, to dismiss Plaintiff's fraud claim for failure to plead the elements with the required specificity.  (*Id.* at 17-22.)  Defendant moves in the alternative, pursuant to Section 1404(a), to transfer venue to the District of New Jersey.  (*Id.* at 22-25.)  Because Defendant's request to transfer this matter presents a threshold issue, the Court will first consider the parties' arguments concerning § 1404(a) before proceeding to the merits of Plaintiff's claims.

## I.      Motion to Transfer Venue

The Court turns first to Defendant's motion to transfer the case to the District of New Jersey.  Upon due consideration of the parties' submissions (ECF Nos. 14-19), the Court concludes that transfer to the District of New Jersey is not warranted.

In considering whether to transfer a case pursuant to Section 1404(a), a court must first establish that the case could have been filed in the transferee district and, if so, determine whether the convenience and the interest of justice favor transfer.  *See, e.g., Bosson v. Buena Cepa Wines*, No. 11-CV-6890 (VB), 2011 WL 6182368, at *1 (S.D.N.Y. Dec. 12, 2011); *Fuji Photo Film v. Lexar Media*, 415 F. Supp. 2d 370, 373 (S.D.N.Y. 2006).

The answer to the first inquiry is yes –this action could have been brought in the District of New Jersey and there is no dispute as to the issue.  § 1404(a) does not condition transfer on the initial forum's being "wrong" and it permits transfer to any district where venue is also proper (*i.e.,* "where [the case] might have been brought") or to any other district to which the parties have agreed by contract or stipulation.  *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 U.S. 568, 579 (2013).  The question whether venue is "wrong" or "improper" is generally

governed by 28 U.S.C. § 1391.[5]  *Id.* at 578 ("The most reasonable interpretation of [1404(a)] is that a district court cannot be 'wrong' if it is one in which the case could have been brought under § 1391").  That provision states that "[e]xcept as otherwise provided by law … this section shall govern the venue of all civil actions brought in district courts of the United States." § 1391(a)(1). It further provides that "[a] civil action may be brought in – (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." § 1391(b).  When venue is challenged, the court must determine whether the case falls within one of the three categories set out in § 1391(b).  *Atl. Marine Const.*, 134 U.S. at 577.

In the instant action, Defendant resides in the District of New Jersey, where it is incorporated, has its nerve center, and does business.  (Compl. ¶ 2; Def.'s Mem. at 23.)  Since Defendant is "at home" in the District of New Jersey, it resides in the proposed transferee district for the purposes of Section 1400(a).  Therefore, the first prong of the inquiry for a motion to transfer venue is satisfied.  Since the action could have been filed in the District of New Jersey, the Court will now consider the nine factors mentioned above to determine if transfer is appropriate.  *See N.Y. Marine & Gen. Ins.*, 599 F.3d 102, 112 (2d Cir. 2010).

---

[5] Section 1391 governs "venue generally," that is, in cases where a more specific venue provision does not apply.  *Cf., e.g.*, §1400 (identifying proper venue for copyright and patent suits).

1.  Convenience to Witnesses

Convenience to witnesses is typically the most important consideration in deciding a motion to transfer venue.  See *Freeplay Music v. Gibson Brands*, No. 16-CV-1457 (VM), 2016 WL 4097804, at *2 (S.D.N.Y. Jul. 18, 2016); *Tillery v. NYS Office of Alcoholism & Substance Abuse Servs.*, No. 13-CV-0035, 2013 WL 6405326, at *4 (S.D.N.Y. Dec. 5, 2013) ("This factor is 'traditionally viewed as the most important.'").  And within that, the convenience to non-party witnesses is accorded more weight than that of party witnesses.  *Capitol Records v. VideoEgg*, 611 F. Supp. 2d 349, 366 (S.D.N.Y. 2009).

The parties' disagreement about the location of party and third-party witnesses and the availability of process to compel the latter does not favor transfer to the District of New Jersey. On this point, the moving party must "'clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover."  *AEC One Stop Grp.*, 326 F. Supp. at 529 (internal citations omitted); *see also Caldwell v. Slip–N–Slide Records, Inc.*, No. 10-CV-9106, 2011 WL 3251502, at *3 (S.D.N.Y. Jul. 26, 2011) ("In a motion to transfer venue, the movant bears the burden of identifying any and all potential witnesses who would [be] inconvenienced if the suit were to remain in the forum chosen by plaintiff.").  In its primary and only argument Defendant alleges that "the teachers and administrators from AIMS Education are located in New Jersey."  (Def.'s Mem. at 24.)  Defendant may well be right that several potential witnesses reside within the District of New Jersey, but they simply never substantiate the point. Defendant fails to "clearly specify" the names or roles of (party or non-party) witnesses that will likely testify on its behalf or make a general statement of what their testimony will cover.  *See AEC One Stop Grp.*, 326 F. Supp. 2d at 529 ("To succeed on a transfer motion, the moving party must "clearly specify the key witnesses to be called and must make a general statement of what

their testimony will cover."). Even if the Court were to assume that some compelling interest exists in keeping witnesses unnamed, Defendant is required, at minimum, to specify the topics covered by witness testimony, the number of witnesses that would testify on those topics, and whether the majority of these potential witnesses would be inconvenienced if the suit were to remain in New York.

Plaintiff does not fundamentally contest Defendant's broad facts. Instead, he lamely asserts that this factor weighs in favor of New York because he

> "… verily believes that many, if not most, of the witnesses who will be subpoenaed to testify reside in the State of New York, and within the eight counties comprising the United State District Court for the Southern District of New York; such belief can only be corroborated in the course of discovery."

(Pl.'s Opp'n Mem. at 14.) To be sure, neither party presents a persuasive portrait or credible alternative of who the trial's important witnesses might be. But the movant, in this case the Defendant, is the party who bears the burden of proving that New York is an inconvenient forum. Because Defendant failed to demonstrate by clear and convincing evidence that New York would particularly inconvenience witnesses or lack process to compel their appearance, this factor ultimately weighs against transfer. *Flood v. Carlson Rests.*, 94 F. Supp. 3d 572, 577 (S.D.N.Y. 2015).

2. Plaintiff's Choice of Forum

As a general matter, "a plaintiff's choice of forum should not be disturbed unless the balance of the factors tips heavily in favor of a transfer." *Rush v. Fischer*, 923 F. Supp. 2d 545, 556 (S.D.N.Y. 2013) (internal quotation marks omitted). At the same time, "[t]here is no rigid formula for balancing" the remaining factors and "no single one of them is determinative." *Larew v. Larew*, No. 11-CV-5771 (BSJ) (GWG), 2012 WL 87616, at *3 (S.D.N.Y. Jan. 10, 2012).

Ultimately, district courts "have broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered on a case-by-case basis." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006).

Typically, the plaintiff's choice of forum is given substantial deference especially if it is the plaintiff's home state. *See, e.g.*, *Atl. Recording Corp. v. Project Playlist*, 603 F. Supp. 2d 690, 698 (S.D.N.Y. 2009) ("The Second Circuit has consistently held that 'a plaintiff's choice of forum is presumptively entitled to substantial deference'") (citing *Gross v. BBC,* 386 F.3d 224, 230 (2d Cir.2004)); *accord Pollux Holding v. Chase Manhattan Bank*, 329 F.3d 64, 71 (2d Cir. 2003) (holding that "when a plaintiff sues in his home forum, that choice is generally entitled to great deference because it is presumed to be convenient"). In this instance, New York is the Plaintiff's home state. (Compl. ¶ 2.)

While some courts have accorded less deference to a plaintiff's choice of forum where the case lacks significant contacts with the forum state, less deference does not equal transfer. *Kwik Goal v. Youth Sports Publ'g*, No. 06-CV-395, 2006 WL 1517598, at *2 (S.D.N.Y. May 31, 2006) ("[C]ourts have accorded less deference to a plaintiff's choice of forum if the case lacks material or significant contacts with the forum state"). Therefore, despite Defendant's argument to the contrary, Plaintiff's choice of forum is entitled to at least some deference. Although many of the operative facts relate to New Jersey (mainly that Plaintiff traveled to and completed his education program in New Jersey) there is a [potential] connection with New York in that New York is where Plaintiff seems to have discovered the alleged breach of contract and fraud. He has sought and been denied employment in New York. And while Plaintiff has also sought employment more broadly in New Jersey and Connecticut, none of the facts suggest that Plaintiff has a stronger preference for any state within the tristate area. (Compl. ¶ 14.) Because there is no indication that

Plaintiff chose New York for illegitimate forum-shopping reasons and Defendant has failed to show transfer is warranted by "clear and convincing evidence," the Court will not disturb Plaintiff's choice. Therefore, this factor weighs in favor of keeping the case in New York.

    3. <u>Remaining Factors</u>

The balance of the remaining factors does not tip in favor of transfer, let alone heavily. The factors are either neutral or weakly favor New York over New Jersey. For one thing, although Defendant devotes a substantial amount of its briefing to arguing that only one factor favors New York – namely, deference to Plaintiff's choice of forum – it fails to demonstrate by clear and convincing evidence that relevant documents and the relative ease of access to sources of proof materially favor New Jersey. Given electronic discovery, and absent any concrete illustration of inconvenience to either side relating to documents or other non-testimonial evidence, this factor is neutral. *Guardian Life Ins. Co. of Am. v. Hernandez*, No. 11-CV-2114 (SAS), 2011 WL 3678134, at *3 (S.D.N.Y. Aug. 22, 2011) (finding that this factor did not favor either side "because modern technology has made the transportation of documents relatively easy").

Similarly, neither party looks to the relative means of the parties to argue which district should retain venue. Therefore, the Court can only assume that Plaintiff's choice is entitled to greater deference as the individual squaring off with an institution. *Contra Holiday Image v. Victoria's Secret Stores Brand Mgmt.*, No. 14-CV-8660 (JMF), 2015 WL 366931, at *5 (S.D.N.Y. Jan. 28, 2015) (finding "the relative means of parties … is not entitled great weight where plaintiff and defendant are both corporations") (citing *AIG Fin. Products Corp. v. Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash.*, 675 F. Supp. 2d 354, 371 (S.D.N.Y. 2009) ("In determining whether the relative means of the parties weighs in favor of transfer, a court should determine whether a party's financial situation would meaningfully impede its ability to litigate this case in either forum."

(internal quotation marks omitted)).  As there is no evidence to conclude that Defendant's financial situation "would meaningfully impede" its ability to pursue its claims in New York, this factor weighs in favor of New York.

Finally, it is not, at this point, clear that efficiencies will be realized by sitting this litigation in the District of New Jersey.  Because of its conjectural nature, this factor carries no weight. Accordingly, for the reasons discussed above, the Court finds that the totality of the venue factors favor the Southern District of New York.

## II.      Motion to Dismiss Plaintiff's Claims

To date, Plaintiff has been unable to secure employment as an MRI technician.  Plaintiff alleges that the AIMS Education Handbook and Program Catalog represented several "promises" that remain unfulfilled, entitling him to damages for breach of implied or quasi contract. Defendant counters that these allegations are non-cognizable claims of educational malpractice. Defendant also argues that Plaintiff's fraud and misrepresentation claim fails for lack of specificity pursuant to Rule 9(b).  As a final matter, the Court notes that Defendant's motion to dismiss does not address Plaintiff's unfair and deceptive business practices claim whatsoever.

Before addressing the merits of Plaintiff's claims, the Court must first resolve what law applies to each claim.  Neither the Enrollment Contract nor the Employment Assistant Consent form contain choice-of-law provisions opting for New Jersey or New York law.  (Enrollment Agreement, Ex. 4; Employment Consent Form, Ex. 6.)  Neither party clearly argues choice of law nor point the Court decidedly toward a particular forum.[6]

---

[6] Both parties cite New Jersey and New York law to support their arguments.  *Cf. Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011) (ignoring the choice of law issue "[w]here the parties agree that New York law controls, that is sufficient to establish choice of law.").

15

A federal court sitting in diversity applies the choice-of-law principles of the state in which it sits, in this case New York law. *First Hill Partners, LLC v. BlueCrest Capital Mgmt. Ltd.*, 52 F. Supp. 3d 625, 632 (S.D.N.Y. 2014) (citing *Banker v. Nighswander, Martin & Mitchell*, 37 F.3d 866, 871 (2d Cir. 1994)); *accord Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941). In New York, "the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). An "actual conflict" exists where "the applicable law from each jurisdiction provides different substantive rules" and those differences are "relevant to the issue at hand[ ] and … have a significant *possible* effect on the outcome of the trial." *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331-32 (2d Cir. 2005) (emphasis in original) (citations and internal quotation marks omitted). Where there is no actual conflict, a choice-of-law analysis is unnecessary and New York law will apply. *See Curley,* 153 F.3d at 12.

However, if the court finds an actual conflict in the applicable law of each jurisdiction, the court embarks on a choice-of-law analysis. New York maintains two choice-of-law tests – one for contract claims and one for tort claims. *See GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir. 2006); *First Hill Partners* 52 F. Supp. 3d at 632–33. The claims alleged here sound in both contract (breach of implied contract) and tort (fraud, unfair and deceptive business practices).

1. Breach of a Quasi or Implied-in-Law Contract

   a. *Choice of Law*

Plaintiff's opposition brief does not cite to a single case for breach of implied contract. (*See* Pl.'s Opp'n Mem. at 10-12.) Plaintiff instead reiterates the claims alleged in the Complaint, mainly that Defendant's "website and advertisements" represented that (1) "[t]he number of MRI

job opportunities is growing faster than the availability of qualified MRI Technologists," which "has resulted in tremendous career opportunities for all [AIMS'] graduates"; (2) the school represented that only a "High School Diploma or GED" was "minimally required" to work as an MRI Tech; *and* (3) the MRI program is a "'comprehensive education and training course' which includes, inter alia, 'IV (abbreviation for intravenous) Therapy.'"  (Pl.'s Opp'n Mem. at 10-11.)

Defendant argues that "New Jersey law applies to [P]laintiff's contract claim because New Jersey has the more significant contacts," (Def.'s Mem. at 10), but Defendant fails to first address whether New Jersey and New York have different substantive rules that are relevant to the issue of implied contracts between students and educational institutions, as required by a federal court sitting in diversity.  Defendant's memorandum analyzes Plaintiff's implied contract claim under New York law.  However, as best the Court can tell, Defendant also argues that it would prevail under either the law of New York or New Jersey.  (*See id.* at 10 n. 5 (asserting that "dismissal of Plaintiff's Complaint is warranted under both New York and New Jersey since both states have adopted the educational malpractice doctrine, barring claims by students against their schools").)  The Court will now analyze each state's substantive rules regarding student-university conflicts.

Under New York law, "when a student is admitted to a school, an implied contract arises between the student and the school." *Dasrath v. Ross Univ. Sch. of Med.*, 494 F. App'x 177, 178 (2d Cir. 2012) (citing *Clarke v. Trs. of Columbia Univ.,* No. 95-CV-10627 (PKL), 1996 WL 609271, at *5 (S.D.N.Y. Oct. 23, 1996)); *accord Deen v. New School Univ.*, 2007 WL 1032295 (S.D.N.Y. 2007), at *2.  "The terms of the implied contract are supplied by the bulletins, circulars and regulations made available to the student." *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998).  "Implicit in this contract is that the university must act in good faith in dealing with the student."  *Id.*; *see also Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d 408, 414 (1980).  This

17

analysis has been extended to include private vocational schools. *See Moy v. Adelphi Inst., Inc.*, 866 F. Supp. 696, 706 (E.D.N.Y. 1994) (analyzing educational malpractice doctrine in claims alleged against a private school training students for occupations in accounting, business administration, secretarial services, computer programming, and word processing).

New Jersey law similarly "recognizes an implied agreement between students and institutions of higher education." *Mehta v. Fairleigh Dickinson Univ.*, No. 09-CV-0455 (SDW), 2012 WL 458421, at *8 (D.N.J. Feb. 9, 2012), *aff'd in part, vacated in part, remanded*, 530 F. App'x 191 (3d Cir. 2013) (citing *Mittra v. Univ. of Med. And Dentistry of N.J.,* 316 N.J. Super. 83, 719 A.2d 693 (App.Div.1998)).[7]   New Jersey courts have also recognized implied agreements between students and private vocational schools. *See, e.g., Mittra v. Univ. of Med. & Dentistry of New Jersey*, 316 N.J. Super. 83, 85, 719 A.2d 693, 695 (App. Div. 1998) (concerning suit commenced by former dental student against the University of Medicine and Dentistry of New Jersey); *see also Swidryk v. Saint Michael's Med. Ctr.*, 201 N.J. Super. 601, 493 A.2d 641, 643 (N.J. Super. Ct. Law Div. 1985) (court noted that although many cases alleging educational malpractice arise in the context of public education, "[t]he same rationale for precluding a cause of action for educational malpractice has also been found to apply when the defendant is a private school."). New Jersey law mandates that "the relationship between a student and a university is *not* simply a matter to be addressed in terms of contractual rights." *Gourdine v. Felician Coll.*, No. A-5248-04T3, 2006 WL 2346278, at *4 (N.J. Super. Ct. App. Div. Aug. 15, 2006) (citing *Romeo v. Seton Hall Univ.*, 378 *N.J. Super.* 384, 393, 875 A.2d 1043 (App. Div.), *certif. denied,* 185 *N.J.* 295, 884

---

[7] Under New Jersey law, the "true" university-student "contract" is one of mutual obligations implied, not in fact, but by law; it is a quasi-contract which is "created by law, for reasons of justice without regard to expressions of assent by either words or acts." *Beukas v. Bd. of Trustees of Fairleigh Dickinson Univ.*, 255 N.J. Super. 552, 566, 605 A.2d 776, 783–84 (Law. Div. 1991), aff'd, 255 N.J. Super. 420, 605 A.2d 708 (App. Div. 1992)).

A.2d 1265 (2005) (emphasis added)).[8]  In lieu of contractual principles, some New Jersey courts have held that "the relationship between the students and the university … should be tested instead in light of principles of quasi-contract and good faith." *Gourdine*, 2006 WL 2346278, at *4 (citing *Beukas v. Bd. of Trustees of Farleigh Dickinson Univ.,* 255 N.J. Super. 552, 556, 605 A.2d 776 (Law Div.1991), *aff'd*, 255 N.J. Super. 420, 605 A.2d 708 (App.Div.1992)).[9]  "A quasi-contract is not a true contract but arises because of considerations of equity and morality and is distinguished from an express contract or even one implied in fact which arises from mutual agreement and intent to promise." *Beukas*, 255 N.J. Super. at 566.[10]  Therefore, New Jersey's theory of quasi-contract permits imposing liability on educational institution found to have acted capriciously or in bad faith.

Some New York courts have also held that contractual claims are subject to judicial review "to determine whether [the school] abided by [its] own rules, and whether [it has] acted in good faith or [its] action was arbitrary or irrational." *Gertler v. Goodgold*, 107 A.D.2d 481, 487 N.Y.S.2d

---

[8] In an albeit unpublished decision, this Third Circuit decision noted that New Jersey courts have "reject[ed] the rigid application of contractual principles to university-student conflicts involving academic performance and [have] limit[ed] [their] scope of review to a determination [of] whether the procedures followed [by the school] were in accordance with the institution's rules and regulations." *Mehta v. Fairleigh Dickinson Univ.*, 530 F. App'x 191, 196 (3d Cir. 2013) (affirming the District Court's grant of summary judgment in favor of Defendants regarding breach of contract claim); *Mittra v. Univ. of Med. & Dentistry of N.J.*, 316 N.J. Super. 83, 719 A.2d 693, 697 (1998); *see also Napolitano v. Trs. of Princeton Univ.*, 186 N.J. Super. 548, 453 A.2d 263, 270 (1982).

[9] "An institution involved in training health care professionals, where the conferral of a degree places the school's stamp of approval upon the student as qualified to practice the profession … should be free to determine its ability to meet its educational responsibility so long as it does not act arbitrarily or in bad faith." *Beukas v. Bd. of Trustees of Fairleigh Dickinson Univ.*, 255 N.J. Super. 552, 567, 605 A.2d 776, 784 (Law. Div. 1991), *aff'd*, 255 N.J. Super. 420, 605 A.2d 708 (App. Div. 1992) (citing *Doherty v. Southern College of Optometry*, 862 F.2d 570, 576 (6th Cir.1988)).

[10] "An institution involved in training health care professionals, where the conferral of a degree places the school's stamp of approval upon the student as qualified to practice the profession, *see, Doherty v. Southern College of Optometry,* 862 *F*.2d 570, 576 (6th Cir.1988), should be free to determine its ability to meet its educational responsibility so long as it does not act arbitrarily or in bad faith. This is because it has an obligation, not only to its students, but to the public at large." *Beukas v. Bd. of Trustees of Fairleigh Dickinson Univ.*, 255 N.J. Super. 552, 567, 605 A.2d 776, 784 (Law. Div. 1991), *aff'd*, 255 N.J. Super. 420, 605 A.2d 708 (App. Div. 1992).

565, 570 (1985), *aff'd,* 66 N.Y.2d 946, 498 N.Y.S.2d 779, 489 N.E.2d 748 (1985). Moreover, in

such cases, "'[t]he mere allegation of mistreatment without the identification of a specific breached

promise or obligation does not state a claim upon which a relief can be granted.'" *See Rodriguez*

*v. N.Y. Univ.*, No. 05–CV–7374, 2007 WL 117775, at *4 (S.D.N.Y. Jan. 16, 2007) (quoting *Gally*

*v. Columbia Univ.*, 22 F. Supp. 2d 199, 206–07 (S.D.N.Y.1998)).

Defendant argues that even assuming an implied contract existed between Plaintiff and AIMS,

Plaintiff's claims are automatically barred by the educational malpractice doctrine under both New

York and New Jersey law.[11]   The Court disagrees in so far as Defendant fails to categorize the full

range of educational malpractice cases under New York law.   While Defendant is correct that a

student cannot request judicial review of purely academic determinations that would require the

Court to evaluate "the course of instruction" or "the soundness of educational methodology" under

either New York (*Paladino v. Adelphi Univ.*, 89 A.D.2d 85, 92, 454 N.Y.S.2d 868, 872-73 (2d

Dep't 1982)) or New Jersey law (*Myers v. Medford Lakes Bd. of Ed.*, 489 A,2d 1240, 1241 (N.J.

App. Div. 1985)), the Court finds that New York law is slightly broader than New Jersey law

regarding student-university conflicts.   By way of example, under New York law a student may

sue a school for failing to provide "certain specified services" for which she or he has contracted,

such as "a designated number of hours of instruction."   *Paladino*, 89 A.D.2d at 92.   Where "the

---

[11] The educational malpractice doctrine recognizes that "professional educators – not judges – are charged with the responsibility for determining the method of learning that should be pursued for their students." *Paladino v. Adelphi Univ.,* 89 A.D.2d 85, 454 N.Y.S.2d 868 (2d Dep't 1982) at 873.   "It also acknowledges that schools are subject to oversight by the Department of Education, which sets forth regulations, oversees licensing, and has the power to step in when a school fails to meet its obligations." *Id.* at 872. "To entertain a cause of action for educational malpractice would require the courts not merely to make judgments as to the validity of broad educational policies ... but, more importantly, to sit in review of the day-to-day implementation of these policies." *Donohue v. Copiague Union Free Sch. Dist.,* 47 N.Y.2d 440, 418 N.Y.S.2d 375, 391 N.E.2d 1352, 1354 (1979). General claims about the quality of an education "are not statements of fact capable of proof, but rather opinions which should not provide a basis for the imposition of liability." *Alligood v. Cnty. of Erie,* 299 A.D.2d 840, 749 N.Y.S.2d 349 (2002).

school failed to meet its obligation, then a contract action with appropriate consequential damages might be viable."  (*Id.*)  The Court was unable to find any analogous cases or a factual equivalent under New Jersey law.

Here, Plaintiff claims that AIMS failed to provide the required instruction for intravenous therapy and skills.  Construing Plaintiff's Complaint most liberally, Defendant may well have failed to provide the "specified service" as advertised, including the designated hours of intravenous instruction.  Lacking any case law to the contrary, a New Jersey court is likely to classify Plaintiff's claim as a tort claim for educational malpractice, and thus bar the suit in its entirety.[12]  By contrast, Plaintiff could theoretically still proceed on his contract claim under New York law,[13] provided that he prove: (1) existence of an agreement; (2) adequate performance by plaintiff, (3) breach by defendant, and (4) damages.  *Papaspiridakos v. Educ. Affiliates, Inc.*, No. 10-CV-5628 (RJD) (JO), 2013 WL 4899136, at *3–4 (E.D.N.Y. Sept. 11, 2013), *aff'd*, 580 F. App'x 17 (2d Cir. 2014) (citing *Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir. 1996)).  This difference, while slight, has the potential to alter a court's analysis under the instant facts.  Thus, to the extent that courts in New York may apply contract principles to student-university suits in

---

[12] "When considering breach of contract claims based on inadequate or ineffective educational services (rather than claims based on breach of an express contractual provision), New Jersey courts have noted that such claims are comparable to a tort claim for educational malpractice."  *M.G. v. Crisfield*, No. CIV-A-06-5099 (FLW), 2009 WL 2920268, at *10 (D.N.J. Sept. 11, 2009) (citing *Stein-O'Brien v. Pennington School*, No. 06-2101, 2008 WL 160588 (E.D. Pa. Jan. 15, 2008) (Eastern District of Pennsylvania reviewing issue of educational malpractice under New Jersey law).

[13] The Court notes that even if Plaintiff's claims were to proceed under New York law, they are unlikely to succeed in the end.  First, Plaintiff does not assert a traditional contract claim, choosing to allege a quasi contract instead.  And even if we treat Plaintiff's claims as a traditional contract, it is difficult to see how Plaintiff will argue against Defendant's disclaimers that it will assist, but not guarantee, graduates employment.  Assuming Plaintiff overcomes these threshold issues and can establish a viable contract claim, "not every dispute between a student and a university is amenable to a breach of contract claim" under New York law.  *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206.  As a matter of public policy, New York courts (like those in New Jersey) consistently decline to entertain actions where "the essence of the complaint is that the school breached its agreement by failing to provide an effective education."  *Paladino v. Adelphi Univ.*, 89 A.D.2d 85, 454 N.Y.S.2d 868 (2d Dep't 1982).

a manner that is slightly broader than New Jersey courts – and in the absence of a factually similar or analogous case in New Jersey – the Court finds the difference represents a conflict.

If there is a conflict, in a contract case, "[i]t is well settled that New York has long recognized 'the use of a center of gravity or grouping of contacts analytical approach to choice of law questions.'" *Feldman Law Grp. P.C. v. Liberty Mut. Ins. Co.*, 819 F. Supp. 2d 247, 255 (S.D.N.Y. 2011), *aff'd,* 476 F. App'x 913 (2d Cir. 2012) (citing *In re Liquidation of Midland Ins. Co.*, 16 N.Y.S. 2d 609 (1994) (internal citations omitted)).  Among the factors to consider are "the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *Feldman Law Grp. P.C. v. Liberty Mut. Ins. Co.*, 819 F. Supp. 2d 247, 255 (S.D.N.Y. 2011), *aff'd*, 476 F. App'x 913 (2d Cir. 2012) (citations omitted).

Here, Plaintiff contends that he signed the Enrollment Contract with Defendant in New Jersey, and that all meetings between Plaintiff and Defendant occurred in New Jersey.  Because Plaintiff attended all classes in New Jersey, where the AIMS Education campus is located, New Jersey is also the primary place of performance.  While the parties have different domiciles, the bulk of the factors clearly favor New Jersey as the "center of gravity."  Therefore, the Court will apply New Jersey law.

### b.  Merits Analysis

Having determined that New Jersey contract law applies, the Court will now assess Plaintiff's claim for breach of implied contract.  Plaintiff's ill-defined implied breach of contract is set out as follows: Defendant's website, advertisements, and course manual – taken together – constitute an implied guarantee that students who successfully complete and graduate from the MRI Tech program should be legally employable as MRI technicians.  (Pl.'s Opp'n Mem. at 11.)  To support

the allegation that "AIMS Education's MRI Technologist program is absolutely worthless," Plaintiff claims that (1) the phlebotomy and intravenous skills training he received was insufficient; (2) AIMS mischaracterized the minimum education and type of license required to administer intravenous injections as an MRI Tech; and (3) AIMS misrepresented the employment prospects of graduates with ARMRIT certificates.  (Compl. ¶¶ 20, 16, 13, & 19.)

Defendant argues for the narrowest interpretation of New Jersey law by citing only cases in which New Jersey's educational malpractice doctrine barred students' allegations regarding the sufficiency, adequacy, and quality of their education.  But the Court notes that Defendant does so without referring to the limits imposed by New Jersey's administrative law approach to student-university conflicts.  New Jersey law is clear to distinguish between cases where the court is being asked to evaluate inadequate or ineffective education services (*see, e.g.*, *Myers*, 489 A.2d at 1241) from those where the court is evaluating whether an educational institution fairly adhered to its own rules and regulations (*see, e.g., Beukas* 255 N.J. Super. at 568) (concluding that applying quasi-contract theory "is the most efficient and legally consistent theory to resolve a university-student conflict resulting from an administrative decision" to eliminate a university program because of financial hardship).  While some New Jersey courts have noted that inadequate or ineffective claims are comparable to a tort claim for educational malpractice, others have held that administrative disputes are comparable to principles of association law or the administrative law standard of arbitrary and capricious conduct.  Thus, the first inquiry under New Jersey law is whether Plaintiff's claim sounds more in tort or administrative law.

None of the New Jersey cases approximate the instant facts under either approach.  It is therefore unclear whether a New Jersey court would apply a tort or administrative law analysis in the instant case.  And "when diversity jurisdiction forces us to grapple with an uncertain question

of state law, we should approach the problem with the background assumption that the state judiciary would not formulate a new rule of equity that would produce an unfair result." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 570 (6th Cir. 2003).  Nevertheless, the Court finds it is not necessary to decide the question because Plaintiff's claims for breach of implied contract fails under both of New Jersey's approaches to student-university conflicts.

To start, Plaintiff's claim would be entirely barred under New Jersey's tort approach given that "[e]ducational malpractice has not been approved as a theory of recovery …." *Myers* 199 N.J. at 513.   Plaintiff asserts that Defendant failed to sufficiently train him in intravenous skills "essential[ly] require[d] of almost every available employment opportunity for an MRI Technologist." (Compl. ¶ 13.)  He further states that AIMS wrongfully "deemed [the phlebotomy class] to be *sufficient* training, although no student, including plaintiff, ever physically set up an intravenous." (Compl. ¶ 16.) (emphasis added.)  We agree with Defendant that the substance of Plaintiff's challenge is directed at the sufficiency and adequacy of his intravenous therapy training, which is "precisely the kind of dispute[] that [New Jersey] courts [are] hesitant to resolve." *Mittra v. University of Medicie and Dentistry of New Jersey*, 316 N.J. Super. 83, 91 (App. Div. 1998).  Under New Jersey law, claims regarding the sufficiency of education, even if framed as a breach of implied contract, cannot be evaluated because they are barred by the educational malpractice doctrine.  *See, e.g.*, *O'Brien v. Pennington Sch.*, No. CIV.A. 06-2101, 2008 WL 160588, at *6 (E.D. Pa. Jan. 15, 2008) (applying New Jersey law and finding that "[w]hen considering breach of contract claims based on inadequate or ineffective educational services (rather than claims based on breach of an express contractual provision), New Jersey courts have noted that such claims are comparable to a tort claim for educational malpractice") (citing *Swidryk v. Saint Michael's Med.*

*Ctr.*, 201 N.J. Super. 601, 493 A,2d 641, 642 (N.J. Super. Ct. Law Div. 1985) (noting that it is "mere characterization" to label such a claim as a breach of contract rather than a tort)).

Plaintiff's claim also fails under New Jersey's administrative law approach.  While New Jersey courts will not intervene in conflicts predicated upon the quality and adequacy of the course of instruction, they will resolve conflicts that involve determining "whether the procedures followed were in accordance with the institution's rules and regulations."  *Mittra*, 316 N.J. Super. at 90. Plaintiff does not plead the existence of any extrinsic evidence or anything else that could support an alternative holding that the Defendant deviated in some significant way from its published rules and regulations.  First, Plaintiff repeatedly "acknowledge[d] that AIMS Education does not warrant or guarantee that successful completion by the student of the program will result in the student obtaining employment in any field or profession" when he signed his Enrollment Contract, Catalog Consent Form,[14] and registry assistant consent form.  (*See* Enrollment Contract; Course Catalog at 14; Employment Consent Form; respectively.)  Moreover, Defendant's course catalog states that "[u]pon satisfactory completion of the MRI ARMRIT Certification Program, the graduate is eligible to sit for the ARMRIT Certification exam for the MRI technologist."  (Course Catalog at 59.)  Because Plaintiff successfully completed the course and passed the ARMRIT Certification exam (Compl. ¶ 20), he lacks a basis for relief under New Jersey law.  *See Gourdine*, 2006 WL 2346278, at *6 (N.J. Super. Ct. App. Div. Aug. 15, 2006) ("Even if the statement about eligibility to sit for that examination were false, plaintiffs would only possibly have sustained damages had they completed that program and been unable to sit for the examination.").

---

[14] The Course Catalog, incorporated by reference in the Catalog Consent Form, states that"[t] he student acknowledges that AIMS EDUCATION ("school") does not warrant or guarantee that successful completion by the student of the programs will result in the student obtaining employment in any field or profession." (Course Catalog at 14.)

Plaintiff further claims that that Defendant failed to clarify either that (1) it did not provide a separate certificate for intravenous therapy (Compl. ¶ 15) and (2) such certificate programs would require at least an associate's degree. (Compl. ¶ 17.)  With these allegations Plaintiff is proposing that Defendant should have made *additional* representations in its materials rather than Defendant deviated significantly from *existing* rules and regulations, a claim relegated to Plaintiff's fraud and deceptive practices claims discussed below.  Plaintiff has not alleged any facts to suggest that Defendant acted capriciously or in bad faith.  Thus, the Court finds that Plaintiff's claim fails under New Jersey's administrative law approach.  Because Plaintiff's quasi contract claim cannot proceed under either an administrative or tort law approach under New Jersey law, it must be dismissed.[15]

### 2. Fraud and Misrepresentation

#### a. *Choice of Law*

The Court finds that there is no actual conflict of law with respect to Plaintiff's second cause of action.[16]  Both New Jersey and New York law require similar elements for a common-law fraud

---

[15] While the Court analyzed Plaintiff's claim under New Jersey law, it notes here that Plaintiff's claim would also be dismissed under New York law for failing to allege how postgraduate statistics were misleading in a material way.  *See Gomez-Jimenez v. N.Y. Law Sch.*, 36 Misc. 3d 230, 258, 943 N.Y.S.2d 834 (Sup. Ct.), *aff'd*, 103 A.D.3d 13, 956 N.Y.S.2d 54 (2012) (dismissing class action against law school because, *inter alia*, plaintiffs failed to allege any misrepresentations "which the court considers specific enough to analyze….").  Here, Plaintiff's Complaint contains only conclusory statements that a court in New York would not consider specific enough to assert a cognizable claim.

[16] The Court notes that because Plaintiff never clarifies whether he is alleging a separate misrepresentation claim (of which there are several types, including intentional or negligent) it has assumed that Plaintiff is proceeding under a material misrepresentation theory based on common law fraud.  This approach seems warranted given that Plaintiff's Complaint fails to allege, for instance, a "special relationship of trust or confidence" between the parties.  *Compare McBeth v. Porges*, 171 F. Supp. 3d 216, 225 (S.D.N.Y. 2016) ("To state a claim for negligent misrepresentation [under New York law] … a plaintiff must allege "'(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.'"  (citing *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014) (internal citations omitted)), *with Peruto v. TimberTech Ltd.*, 126 F. Supp. 3d

claim.  *Compare First Hill Partners, LLC v. BlueCrest Capital Mgmt. Ltd.*, 52 F. Supp. 3d 625,

637 (S.D.N.Y. 2014) (citing *Wynn v. AC Rochester,* 273 F.3d 153, 156 (2d Cir. 2001) ("Under

New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or

omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made

with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5)

which caused injury to the plaintiff."), *with Churchill Downs, Inc. NLR Entm't, LLC v. Carstanjen*,

No. CV-14-3342 (KM) (MAH), 2017 WL 899927, at *11 (D.N.J. Mar. 6, 2017) ("A claim for

common law fraud in New Jersey has five elements: (1) a material misrepresentation of a present

or past fact by the defendant; (2) the defendant's knowledge or belief of its falsity; (3) an intent

that the plaintiff rely on the misrepresentation; (4) reasonable reliance by the plaintiff; and (5)

resulting damages.").  Because there is no actual conflict between New York and New Jersey law

regarding Plaintiff's fraudulent misrepresentation claim, New York law will apply.

   *b.   Merits Analysis*

   Plaintiff asserts that a variety of statements made to him, beginning with the initial, unsolicited

advertisements describing the program, and continuing through the time when Plaintiff completed

the program, are actionable as fraudulent misrepresentations.  Defendant counters that "plaintiff

failed to plead all the elements … with the specificity required by the Fed. R. Civ. P. Rule 9."

(Def.'s Mem. at 17.)

---

447, 457 (D.N.J. 2015) ("Under New Jersey law, [a] cause of action for negligent misrepresentation may
exist when a party negligently provides false information." *Karu v. Feldman,* 119 N.J. 135, 146, 574
A.2d 420 (1990)). In addition, in New Jersey "[t] o prevail on a negligent misrepresentation claim, a
plaintiff must prove that the defendant negligently made an incorrect statement, upon which the plaintiff
justifiably relied." *Green v. Morgan Properties,* 215 N.J. 431, 457, 73 A.3d 478 (2013) (citations
omitted).  "A negligent misrepresentation claim may also be based on an omission where plaintiff
adequately pleads a duty to disclose." *Id.*  (citing *S. Broward Hosp. Dist. v. MedQuist Inc.*, 516 F. Supp.
2d 370, 397 (D.N.J.), *aff'd in part,* 258 Fed. Appx. 466 (3d Cir. 2007)).

Although the rules of federal pleading usually require only "a short and plain statement" of the plaintiff's claim for relief, *see* Fed. R. Civ. P. 8, averments of fraud must be "state[d] with particularity." Fed. R. Civ. P. 9(b). *See ATSI Commc'ns*, 493 F.3d at 99 ("[F]raud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss."). In order to satisfy Rule 9(b), the plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004) (internal citation omitted). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.

To the extent this Court understands Plaintiff to be proceeding on a material misrepresentation theory, Plaintiff's pleadings are wholly conclusory and do not pass muster under Rule 9(b). Plaintiff maintains that Defendant made several affirmative "material misrepresentations." The alleged false statements include: (1) "the number of MRI job opportunities is growing faster than the availability of qualified MRI Technologists," (Compl. ¶ 6); (2) that it provides "a 'comprehensive education and training,' course which includes inter alia 'intravenous therapy'" (*id.*); (3) the program's "admission eligibility as High School Diploma or GED" (*id.* ¶ 7); (4) "the MRI certification program is designed to prepare high school graduates to become MRI technologists and preparing them to sit for the ARMRIT Registry certification examination in Magnetic Resonance Imaging" (*id.* ¶ 9); (5) "57% of its graduates are gainfully employed as MRI Technologists within 180 days after graduation," (*id.* ¶ 19); and (6) "that ARMRIT was accepted everywhere" (*id.*). But short of stating these claims are patently false, Plaintiff fails to explain *why these statements were fraudulent*. Instead, Plaintiff relies on a series of disjointed declarations in

asking the Court to infer that Defendant knowingly made material misrepresentations. Accordingly, Plaintiff has failed to plead fraud with the requisite specificity.

The Court finds Plaintiff's fraudulent misrepresentation claim, as alleged in the Complaint and supplemented by the Opposition unpersuasive, and frankly, bizarre. For example, Plaintiff claims that because Title IV of the Higher Education Act of 1965 was amended, Defendant "was aware, or should have been aware" that there was "a Federal presumption or expectation of employability." (Compl. ¶ 11.) Under this theory, every educational program in the country is presumptively liable for damages when any graduate fails to secure a job. This stance lacks a legal basis. Similarly, Plaintiff claims that Defendant misrepresented what was required to be employed as an MRI technician when it failed to disclose that New York, New Jersey, and Connecticut require separate licenses to administer intravenous injections. (Compl. ¶ 14.) While Plaintiff admits that this license is only available to Radiologic Technologists, he maintains that Defendant misrepresented what was required to become an MRI Technologist. (Compl. ¶ 13.) This allegation is incongruous, provided that Defendant only made claims about MRI technicians and never Radiology Technicians. As a final example, Plaintiff claims that Defendant misrepresented that a GED was the minimum education required to enroll and train to become an MRI Technician. To support this claim, the Complaint states, in a conclusory manner, that that Defendant "knew or should have known, that ARRT, the primary credentialing organization in the United States, as of January 1, 2015, requires as a minimum … an Associate Degree." (Compl. ¶ 17). To start, this alleged change by ARRT in January 2015 occurred *after* Plaintiff enrolled and graduated from Defendant's program. Therefore, it is difficult to comprehend how Defendant knowingly made a false statement (true at the time) to induce Plaintiff's enrollment back in 2012. Moreover,

Defendant never made statements about ARRT.  All statements alleged in the Complaint focus instead on ARMRIT, the competing credentialing organization.

Having reviewed the allegations in a light most favorable to Plaintiff, it seems that only two of Defendant's statements, if false, might represent misstatements of material fact: (1) "ARMRIT is accepted everywhere" and 57% of its graduates are employed upon completing the program. Nevertheless, Plaintiff fails to allege any additional facts or extrinsic eivdence as to why or how these statements are misrepresentations of material fact.  Moreover, there are no allegations supporting that Defendant knew these misrepresentations were false.  Plaintiff is therefore asking the Court to infer that the statements are patently false without *any* basis for such an assumption.

For the reasons discussed above, Plaintiff's fraud claim fails to meet the particularity requirements of Rule 9(b) and must be dismissed.

### 3.  Unfair and Deceptive Business Practices

#### a.  *Choice of Law*

With respect to Plaintiff's third and final cause of action, New Jersey and New York law require similar elements for claims under their respective consumer protection statutes.[17]  *Compare 4 K & D Corp. v. Concierge Auctions, LLC*, 2 F.Supp.3d 525, 547 (S.D.N.Y. 2014) (("To state a prima facie claim under either Section [349 or 350][18], a plaintiff must allege that the defendant (1)

---

[17] Both the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56:8–1 *et seq.*, and New York General Business Law ("NYGBL") § 349, prohibit deceptive practices in connection with the sale or advertisement of consumer goods.  *See, e.g., Daaleman v. Elizabethtown Gas Co.*, 77 N.J. 267, 390 A.2d 566, 569 (1978) (noting that NJCFA is designed to address "sharp practices and dealings in the marketing of merchandise ... whereby the consumer could be victimized by being lured into a purchase through fraudulent, deceptive or other similar kind of selling or advertising practices."); *Small*, 94 N.Y.2d 43 ("Generally, claims under [N.Y. GBL § 349] are available to an individual consumer who falls victim to misrepresentations made by a seller of consumer goods through false or misleading advertising.").

[18] Section 350 has the same elements as Section 349 except that the plaintiff must demonstrate that the defendant's advertisement "(1) had an impact on consumers at large, (2) was deceptive or misleading in a material way, and (3) resulted in injury."  *Koch v. Greenberg*, 14 F. Supp. 3d 247, 261 (S.D.N.Y. 2014),

engaged in consumer-oriented conduct; (2) that the conduct was materially misleading; and (3) that the plaintiff suffered injury as a result of the allegedly deceptive act or practice") *with, Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 192 N.J. 372, 389, 929 A.2d 1076 (N.J. 2007) ("A party asserting a claim under NJCFA must establish (1) wrongful conduct; (2) an ascertainable loss; and (3) and a causal relationship or nexus between the wrongful conduct and the loss.").

The pleading standard is the key substantive difference between the two consumer protection statutes. A claim under New Jersey's Consumer Fraud Act ("NJCFA") is subject to the heightened pleading standard of Fed. R. Civ. P. 9(b), which requires particularized pleading for the conduct underlying fraud claims. *See, e.g.*, *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (noting that "[t]he stringent pleading restrictions of Rule 9(b)" apply to fraud claims under the NJCFA). "This requires a plaintiff to plead the date, time, and place of the alleged fraud, or otherwise inject precision into the allegations by some alternative means." *Grant v. Turner*, 505 Fed. Appx. 107, 111 (3d Cir. 2012), cert. denied, —— U.S. ——, 133 S.Ct. 2770, 186 L.Ed.2d 219 (2013); *see also Schreiber Distrib. Co. v. Serv–Well Furniture Co., Inc.*, 806 F.2d 1393, 1401 (9th Cir. 1986) (plaintiff "must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation.").

Claims under N.Y. GBL § 349, however, are examined under the more liberal pleading standard of Fed. R. Civ. P. 8(a). Unlike the NJCFA, N.Y. GBL § 349 prohibits all "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." Section 349 "extends well beyond common-law fraud to cover a broad range of deceptive

---

*aff'd*, 626 Fed. Appx. 335 (2d Cir. 2015) (internal quotation marks omitted); *see also Weisblum v. Prophase Labs, Inc*., 88 F. Supp. 3d 283, 292 (S.D.N.Y. 2015).

practices," and as such, claims under § 349 are not subject to the heightened pleading standard of Fed. R. Civ. P. 9(b). *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir.2005); see also *In re Ford Fusion and C–Max Fuel Econ. Litig.*, No. 13–2450, 2015 WL 7018369, at *17 (S.D.N.Y. Nov. 12, 2015) ("[C]ourts in the Second Circuit have consistently found that claims under New York General Business Law § 349 are not subject to the heightened pleading standards of Rule 9(b)"); Leonard v. Abbott Labs., Inc., No. 10–4676, 2012 WL 764199, at *19 (E.D.N.Y. Mar. 5, 2012) (noting "categorical rule" that § 349 claims are not subject to the Rule (9) pleading standard, "regardless of whether they 'sound in fraud,' or are premised on specific misrepresentations").

Thus, to the extent that claims under New York's consumer protection statute are examined under a more liberal pleading standards than claims under New Jersey's consumer protection statute, the Court finds the difference represents a conflict.

Plaintiff's unfair and deceptive business practices claim sounds in tort. *See, e.g., Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 236 (1995) (analogizing Illinois' Consumer Fraud and Deceptive Practices Act to a codification of common-law negligence rules) ("Under ordinary tort principles, every person has a duty to exercise reasonable care toward all other persons with whom he comes into contact"). In tort cases where "conduct-regulating standards are at issue," *see In re Grand Theft Auto,* 251 F.R.D. at 149, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders," *see GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.,* 449 F.3d 377, 384 (2d Cir. 2006). Moreover, a court applying New Jersey choice of law to a student-university conflict noted that, "… New Jersey has a strong interest in regulating the educational institutions located within its borders." *O'Brien v. Pennington Sch.*, No. CIV-A-06-2101, 2008 WL 160588, at *6 (E.D. Pa.

Jan. 15, 2008).  Because the Court sees no reason to depart from that rule and finds that the majority of the tort occurred within New Jersey, New Jersey law applies to Plaintiff's unfair and deceptive practices claim.

      *b.  Merits Analysis*

Having determined that New Jersey law applies, the Court will now assess Plaintiff's unfair and deceptive business practices claim under NJCFA.

A party asserting such a claim must establish (1) wrongful conduct; (2) an ascertainable loss; and (3) and a causal relationship or nexus between the wrongful conduct and the loss. *See Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 192 N.J. 372, 389, 929 A.2d 1076 (N.J. 2007).  The New Jersey Supreme Court has explained that the requirement of ascertainable loss in the NJCFA replaces the traditional reliance requirement of a common law tort claim.  *See id*.

Plaintiff's NJCFA claim – which is premised on the same allegations as Plaintiff's fraud and misrepresentation claim – states that Defendant both affirmatively misrepresented and intentionally omitted material facts with the intent to cause Plaintiff to enroll in the MRI Technologist program.  The heightened pleading standards of Rule 9(b) are therefore applicable to Plaintiff's claim under the NJCFA.  *See Frederico v. Home Depot*, 57 F.3d 188, 202 (3d Cir. 2007).  Since the Court concluded that Plaintiff's claim for fraud and misrepresentation fails to satisfy a heightened pleading standard, Plaintiff's claim for unfair and deceptive business practices also fails here.  Therefore, Defendant's motion to dismiss with respect to this claim is also granted.

## CONCLUSION

For the reasons stated above, Defendant's motion to transfer this action to the District of New Jersey is DENIED in its entirety.  Defendant's motion to dismiss Plaintiff's Complaint is GRANTED in its entirety.  The Clerk of the Court is respectfully directed to terminate Docket No. 14.

Dated:   March **17**, 2017                                  SO ORDERED:
      White Plains, New York

                                        NELSON S. ROMÁN
                                    United States District Judge